Sullivan, }
May 5, 1914. }

### NEW ENGLAND BOX CO. *v.* SAMUEL P. FLINT.

Where the owner of a lumber lot, having paid for cutting and sawing by instalments during the progress of the work, seeks to recover overpayments by virtue of the contractor's written agreement to guarantee the quantity for which he received pay, evidence of a trade usage to make final settlement according to surveys of the lumber at the time of its sale is admissible as tending to elucidate the meaning of the contract and to rebut the inferences of laches and waiver which might be drawn from the plaintiff's failure to assert his claim for nearly two years after the completion of the work.

ASSUMPSIT, with a count for covenant broken. The action was brought to recover overpayments made upon a contract under seal for cutting, sawing, and sticking lumber upon a lot in Westmoreland, and was tried before a referee, who made a general finding for the defendant and reported the facts. At the May term, 1913, of the superior court, judgment was ordered for the defendant upon the report by *Kivel*, J., and the plaintiffs excepted.

Under the contract between the parties, Flint agreed to guarantee the amount of lumber he received pay for, and was to be paid for each lot of 100,000 feet as soon as a report thereof was received by the plaintiffs, subject to delays of carriers and other delays beyond the plaintiffs' control. The parties understood that the lumber was to remain on the sticks for a few months for the purpose of drying it before it was taken away for use or sale. The defendant sublet the job to one Pierce, by a contract in writing not under seal, which was in all respects like his contract with the plaintiffs except that the price paid was $5.25 per thousand feet instead of $5.50. The plaintiffs were informed of the subletting and did not object. Pierce begun work in January, 1908, and completed the job on October 17, 1908, with the exception of 29,000 feet which he sawed and stuck in January and February, 1909.

Each piece of lumber was measured as it came from the saw and an account kept, the total of which was reported to the plaintiffs each week. An agent of the plaintiffs visited the mill as often as twice a week to see that the terms of the contract were observed and to keep informed as to the quantity sawed. Whenever a claim was made that 100,000 feet had been sawed, it was the agent's duty to investigate the claim and report to the plaintiffs; and upon his approval of the claim after investigation, the plaintiffs sent a check

for $550 to the defendant, who immediately sent a check for $525 to Pierce. The defendant requested the plaintiffs' agent not to authorize a payment until 100,000 feet on account of which it was made was stuck up. The plaintiffs had notice of the course of business under which the defendant paid Pierce immediately upon receipt of a check from them.

The plaintiffs began to remove the lumber on September 19, 1908. All the lumber except ten carloads was shipped prior to January, 1910, and the last on April 10, 1910. During the progress of the work the plaintiffs paid the defendant upon the mill measurement for 2,000,000 feet. November 3, 1910, they notified him that the lot fell short of the amount paid for by a little over 200,000 feet and requested payment of the sum of $1,174.38 under the guaranty clause of the contract. The amount of lumber manufactured from the lot was 1,900,000 feet. Evidence offered by the plaintiffs of a well known usage among lumber operators to make final settlement for cutting, sawing, etc., according to the surveys of lumber made at the time of its sale was excluded, subject to exception.

The referee found that the delay in asserting a claim under the guaranty clause until November 3, 1910, was unreasonable; and that the plaintiffs, by the way in which they dealt with the defendant and his subcontractor in making payments as hereinbefore stated, waived the guaranty. He also reported that, finding the intention attempted to be expressed by the guaranty clause to be that the guaranty should continue for a reasonable time after the completion of the work, he construed its provisions accordingly, and no exception was taken thereto by either party.

*Flower & Flower* (of Massachusetts) and *Henry S. Richardson* (*Allen Hollis* orally), for the plaintiffs.

*Edward R. Buck* (of Vermont) and *Frank O. Chellis*, for the defendant.

Parsons, C. J. The rule "which forbids the admission of parol evidence to contradict or vary a written contract is not infringed by any evidence of known and established usage respecting the subject to which the contract relates. To such usage, as well as to the *lex fori*, the parties may be supposed to refer, just as they are presumed to employ words in their usual and ordinary signification. . . . Proof of usage is admitted, either to interpret the mean-

ing of the language of the contract, or to ascertain the nature and extent of the contract, in the absence of express stipulations." 1 Gr. Ev., *s.* 292; 4 Wig. Ev., *s.* 2440. "The liberal rule . . . is today conceded, practically everywhere, to permit resort in any case to the *usage* of a *trade* or *locality,* no matter how plain the apparent sense of the word to the ordinary reader." 4 Wig. Ev., *s.* 2463 (2); *George* v. *Joy,* 19 N. H. 544, 546; *Swamscot Machine Co.* v. *Partridge,* 25 N. H. 369, 378. See *Glover* v. *Baker,* 76 N. H. 393, 415.

The evidence offered by the plaintiffs of the custom or usage to make final settlement for cutting, sawing, etc., according to the surveys of lumber made at the time of its sale was competent and should have been admitted. It tended not to contradict, but to make intelligible, the written contract. If proved as a fact within the minds of the parties when the written engagement was entered into, it tended to show what they meant by what they said. The agreement of the defendant "to guarantee the amount of lumber he receives pay for" implies that on some basis of measurement payment might be made, leaving the accuracy of the measurement to be determined at some future time. The evidence tended to show how the parties understood this determination should be made. When made, the defendant's guaranty applied. It is not seriously contended that the evidence was incompetent, but the contention is that the findings of waiver and laches render the construction of the written contract immaterial. But the evidence bore directly upon the question whether what was done in the way of measurement and payment while the sawing was going on was understood as a final settlement, or as a preliminary adjustment to be corrected later under the contract. It also tended to show when in due course it could be ascertained whether the measurement for which the defendant had been paid was erroneous, and hence was material upon the question whether the plaintiffs unreasonably neglected to make claim after they knew or ought to have known of the error.

The referee having found a general verdict for the defendant, states the facts proved before him. It appears that the plaintiffs' claim was based upon the defendant's covenant under seal. The bond and its breach found by the referee are facts inconsistent with the general verdict for the defendant, unless facts are found authorizing the conclusion that, despite the breach of the defendant's covenant under seal, he is not liable in damages therefor. The referee finds that the plaintiffs delayed unreasonably in asserting a

claim under the guaranty, and that by the way the plaintiffs dealt with the defendant and his subcontractor in making payments as stated by him, they waived the guaranty.  Since the evidence which was wrongfully excluded was material upon each of these propositions, it is unnecessary to consider whether the evidentiary facts stated authorize the finding of waiver, or whether unreasonable delay in asserting a claim under the guaranty would of itself estop the plaintiffs from their present claim.

*Plaintiffs' exception sustained: report set aside.*

All concurred.